**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN ADAMS; CATHY ADAMS,
*Plaintiffs-Appellees,*

v.

PAUL SPEERS,
*Defendant-Appellant,*

v.

MERCED COUNTY SHERIFF'S
DEPARTMENT; CALIFORNIA HIGHWAY
PATROL; COUNTY OF MERCED;
MARK PAZIN, Merced County
Sheriff Coroner,
*Defendants.*

No. 05-15159

D.C. No.
CV-02-05741-LJO

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, Magistrate Judge, Presiding

Argued and Submitted
December 4, 2006—San Francisco, California

Filed January 10, 2007

Before: John T. Noonan, Michael Daly Hawkins, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Noonan

239

## COUNSEL

Scott H. Wyckoff, Deputy Attorney General of the State of California, Sacramento, California, for the defendant-appellant.

Jacques LeBoeuf, Oakland, California; Randal W. Hooper, Oakland, California, for the plaintiffs-appellees.

## OPINION

NOONAN, Circuit Judge:

Paul E. Speers, an officer in the California Highway Patrol (CHP), appeals the district court's denial of immunity in this civil rights suit by John and Cathy Adams. Holding that, on the basis of the facts submitted by the Adamses, Speers is not

entitled to immunity as a matter of law, we affirm the judgment of the district court.

## FACTS

Preliminary to statement of the facts, we note that Officer Speers can make an interlocutory appeal from the ruling on immunity only if he accepts as undisputed the facts presented by the appellees. *See Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir. 2001). As Speers' briefs show, he is familiar with this maxim governing such appeals, but at times his briefs lapse into disputing the Adamses' version of the facts and even into offering his own version of the facts. We regret these lapses and, as they are made by the Attorney General of the State of California defending Speers, we take this occasion to advise the Attorney General that such practice could jeopardize our jurisdiction to hear the interlocutory appeal. This exceptional remedy is available only if the issue of immunity is presented as a question of law. *See Johnson v. County of Los Angeles*, 340 F.3d 787, 791 n.1 (9th Cir. 2003).

As an appellate court, we are in no position to adjudicate disputed facts that have not gone through the crucible of trial. Still less are we in a position to accept as true something asserted to be a fact by the appellant that has not been tested in any judicial process. The exception to the normal rule prohibiting an appeal before a trial works only if the appellant concedes the facts and seeks judgment on the law.

The facts as presented by the Adamses are as follows:

Alan Adams, eighteen years of age, the youngest son of John and Cathy Adams, lived with his parents at their home in Hilmar, California. Early in the afternoon of June 26, 2001, Alan borrowed his mother's 1998 Ford Expedition to go to look for work at a nearby dairy. At about 1:30 p.m., a detective from the Merced County Sheriff's department observed Alan run several stop signs. He put on a light to signal Alan

that he should pull over. Alan did not, and a second Sheriff's deputy joined in the pursuit of his car. Two more county officers entered the chase, followed by two CHP vehicles. Alan continued on his course, driving largely within the speed limit, stopping at some stop signs and rolling slowly through others. His driving was "nonchalant" or that of a "rapid Sunday drive." He waved as he passed acquaintances.

Paul Speers had been assigned by the CHP to sit in his patrol car, parked on the road, to serve as a visible deterrent to speeders. On his radio he picked up news of the chase. Shortly after 2:00 p.m. and before his assignment had ended, he decided to join it, first picking up as a spectator a county probation officer who was his occasional partner in apprehending probation violators. Speers drove north and parked at a spot he guessed Alan would pass if he continued his present route.

The Ford Expedition with Alan at the wheel reached the point where Speers was waiting. Without advising the pursuing law enforcement vehicles of his identity or his intentions, Speers put his patrol car into gear, pulled out, and tried to ram Alan's vehicle. He missed. He continued in the procession of police, putting his patrol car at the head of the chase, which was now aided by a police helicopter that hung over the procession.

At 2:51 p.m., Alan's Expedition exited the off-ramp and made a left turn back over the freeway. It then entered the on-ramp to go north. Speers used his patrol car to ram the Expedition. The two cars became entangled. What the CHP report termed "a significant hazard" to both vehicles was created. The adjoining embankment was "very steep." Speers had not taken into consideration where his patrol car would end up. In fact, the patrol car was dragged down the on-ramp for some distance. Then the vehicles separated, and Alan and Speers went on.

At 3:00 p.m., Alan encountered traffic stopped by a collision. He entered the center divider to make a U-turn and change direction. Speers accelerated, leaving the other police cars behind. He cut through the divider and rammed the left rear of Alan's vehicle with sufficient force to knock it off the shoulder of the road and down into a sandy embankment or ditch where it came to rest. The impact was such that Speers' own car spun down the shoulder, its bumper entangled with the Expedition. As the two cars came to rest, they separated.

After the crash, as the CHP report continues, "additional units positioned their patrol vehicles to prevent the suspect vehicle's escape." A CHP unit was stopped on the shoulder of the road about 35 feet from Alan's right rear. Another CHP unit stationed itself 25 feet away from the left rear. A Sheriff's unit came into position about 30 feet away from the Expedition and "slightly off-set to the left rear" of the Expedition. The patrol cars completely surrounded the Expedition, cutting off any possible avenue of escape.

Alan began to inch the Expedition backwards, at no more than 4 to 5 miles per hour, turning slowly to the left and letting the front of the Expedition swing to the right towards Speers' patrol vehicle. Speers pushed his door open and hit the Expedition. At the same time, Officer Marcos Rivera approached the Expedition and stood next to the window on Alan's side. He raised his baton, struck the window and broke it. He reached into Alan's car with the intention of pepper-spraying him.

Before Rivera could act, Speers exited his patrol car, moved away from it, and stood in front of the Expedition as it rolled backwards away from him. He drew his service weapon and trained it on Alan. Without warning that he would use it, he fired six rounds. Alan was killed.

A CHP investigation of the incident found, *inter alia*, that Speers, contrary to regulations, was not wearing body armor

that would "reduc[e] or minimiz[e] the possibility of injury in the event of an accident or shooting." Speers did not obtain permission for the probation officer to ride as his passenger in the chase; the probation officer was untrained in CHP procedure as to pursuits; he was, in the words of the CHP, "an unauthorized passenger." At no time did Speers request or receive permission to enter the pursuit. He failed to communicate with any of the other units engaged in the chase. He was unfamiliar with the area he entered. In his failures to obtain permission and to communicate, he violated CHP policy.

Speers was also found by the CHP to have twice "rammed the suspect vehicle without obtaining permission" and to not have given "consideration to the final resting place of the involved vehicles after the ramming." In each instance, Speers violated CHP rules on ramming. In each instance, Speers disregarded CHP policy that "consideration should be given to the final resting place of the patrol car and its proximity to the violator's vehicle." Speers failed to follow CHP policy in making a stop by the use of force without authorization. In each instance, Speers acted without communication with the other units. The result of the second ramming, in the CHP's words, "left Officer Speers in a vulnerable and hazardous position. Officer Speers had difficulty in exiting the patrol car due to very little room to open the patrol car door." The CHP report concluded, "Based on the previously mentioned violations, it is recommended that Adverse Action be initiated against Officer Paul E. Speers."

When Speers fired the six rounds, as the CHP report also stated, he "did not have a completely clear background for discharging his weapon." Two of the officers on the scene saw no reason why Speers should shoot Alan. According to Speers' own deposition, he did not fire to protect other officers.

## PROCEEDINGS

On August 28, 2002, the Adamses, parents of Alan, filed their first amended complaint seeking damages under 42

U.S.C. § 1983 and the Fourth Amendment to the Constitution and under California law governing wrongful death. Other officers besides Speers were named, but were ultimately dismissed by stipulation. Speers moved for summary judgment, contending that he was entitled to qualified immunity. In a written opinion the court denied his motion.

Following the steps set out in *Saucier v. Katz*, 533 U.S. 194 (2001), the court first determined that, if all the facts were viewed in favor of the Adamses, Speers had violated the Fourth Amendment. *Id.* at 201. The court stated that it is unreasonable for a police officer to "seize an unarmed, non-dangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Serious questions, unresolvable by summary judgment, existed "as to the objective reasonableness of Officer Speers [firing] six rounds into Alan's vehicle in the absence of warning."

The second *Saucier* step was for the court to ask if Speers could have reasonably believed that his conduct did not violate the Constitution. *See Saucier*, 533 U.S. at 205. Speers is off the hook if, on the facts before us, he had the reasonable belief that his conduct was lawful. In short, Speers is not held to a correct constitutional reading, only to a reasonable one. *See id.* The district court concluded that Speers was unreasonable in believing that the law permitted him to fire six rounds at Alan's vehicle. Accordingly, the district court denied him qualified immunity.

Speers appeals.

## ANALYSIS

**[1]** Reviewing de novo the district court's denial, we find its judgment impeccable. On the facts presented by the Adamses and the disciplinary report of the CHP itself, a jury could find Speers to be an officer off on a mission of his own creation, abandoning his assignment, picking up a buddy for

no apparent reason except the excitement of the chase, barging in ahead of the police already engaged in pursuit, once attempting to use force against Alan and twice doing so, creating each time a serious hazard for himself as well as Alan, and finally stepping out of his patrol car and, without warning and without the need to defend himself or the other officers, killing Alan. Shooting of this sort was established as unconstitutional by *Tennessee v. Garner, supra,* almost twenty years ago. *See Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003), *on remand from* 536 U.S. 953 (2002). No officer acting reasonably in these circumstances could have believed that he could use deadly force to apprehend Alan.

The Supreme Court recently stated the governing law in *Brosseau v. Haugen*, 543 U.S. 194 (2004). Two decisions of circuit courts were there cited by the Supreme Court as examples of cases where it was reasonable for an officer to shoot: *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993); *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992). In *Cole* the officer had probable cause to believe that the suspect's truck "posed an imminent threat of serious physical harm to innocent motorists as well as to the officers themselves." 993 F.2d at 1333. In *Smith*, the suspect was cornered at the back of a street, but freed his car and began speeding down the street. The Sixth Circuit noted that the suspect "had proven that he would do almost anything to avoid capture" and that he posed a major threat to officers at the end of the street. *Smith*, 954 F.2d at 347. In *Brosseau* itself, the officer twice ordered the suspect to get out of his car and then broke the window on the driver's side with her handgun. The officer then tried to grab the car keys and struck the suspect with the barrel and butt of her gun. Undeterred, the suspect put the key in the ignition and started his car. The officer fired because she was fearful for the safety of the other officers. The suspect survived the single shot but subsequently pleaded guilty to driving in wilful or wanton disregard for the lives of others. *Brosseau*, 543 U.S. at 196-197. The Supreme Court held that Brosseau was entitled to qualified immunity because her actions fell in the

" 'hazy border between excessive and acceptable force.' " *Id*. at 201 (quoting *Saucier*, *supra*, at 206).

At the same time the Supreme Court reaffirmed the rule of *Tennessee v. Garner* that the shooting of an unarmed, non-dangerous suspect to prevent the suspect's flight is a violation of the Fourth Amendment and that cases would occur where such a violation was "obvious." *Id*. at 199.

**[2]** Accepting the Adamses' facts as true, this case falls within the obvious: the absence of warning and the lack of danger to the shooter or others distinguish the case from *Cole*, *Smith*, and *Brosseau*. On these facts, Officer Speers was not entitled to qualified immunity.

AFFIRMED.